1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

9    DAVID ROMERO,                                    Case No.  1:14-cv-1062-SKO

                Plaintiff,                            **ORDER DENYING IN PART AND**
10                                                     **GRANTING IN PART DEFENDANTS'**
                                                       **MOTION FOR SUMMARY**
11         v.                                          **JUDGMENT/SUMMARY**
                                                       **ADJUDICATION**
12

13   JAMES YATES and EFRAIN JIMENEZ,
                                                       (Doc. 47)
14              Defendants.
     _____/

15

16                            **I.        INTRODUCTION**

17         This case concerns the circumstances surrounding the December 23, 2012 shooting and

18   arrest of Plaintiff David Romero by Defendant California Highway Patrol ("CHP") Officer James

19   Yates (who was off-duty at the time of the arrest) ("Yates") and Defendant CHP Officer Efrain

20   Jimenez ("Jimenez") (collectively "Defendants"), respectively.  On April 17, 2017, Defendants

21   filed a "Motion for Summary Judgment/Summary Adjudication" (the "Motion").  (Doc. 47.)  On

22   May 18, 2017, Plaintiff filed his opposition to the Motion, and on May 31, 2017, Defendants filed

23   their reply.  (Docs. 54 & 56.)  After having reviewed the parties' papers and all supporting

24   material, the matter was deemed suitable for decision without oral argument pursuant to Local

25   Rule 230(g), and the hearing was vacated on June 12, 2017.  (Doc. 58.)

26         For the reasons set forth below, the Court DENIES IN PART and GRANTS IN PART

27   Defendants' Motion.

28

## II.   FACTUAL BACKGROUND[1]

On the night of December 23, 2012, Plaintiff was driving a silver Dodge truck to his home in Madera, California, after watching a football game and having cocktails at a friend's house in Fresno.  (JSUF 1, 7.)  Plaintiff took Highway 99 north and exited Cleveland Avenue.  (JUSF 2.)  As Plaintiff approached the first main cross street, Schnoor Avenue, he went into the left hand lane to turn south.  (JSUF 3.)  A black SUV driven by Defendant Yates, a CHP officer who was off-duty at the time, and his wife Jenny Yates, pulled up behind Plaintiff.  (JUSF 4.)  Plaintiff and Defendant Yates then both turned left onto Schnoor Avenue heading south and over the Fresno River toward a residential area in Madera.  (JUSF 5.)  Plaintiff "quickly changed lanes" in order to go around a vehicle that was turning left off of Schnoor Avenue.  (MPD Report at 8.)

### A.   Plaintiff in his truck, and Defendant Yates and Mrs. Yates in their SUV, Arrive at the Stop Sign at Schnoor and Dutra Avenues, Where Plaintiff Allegedly Runs the Stop Sign.[2]

After the turn onto Schnoor Avenue, Plaintiff was in the number 1 (left) lane, and Defendant Yates and his wife were in an SUV in lane number 2 (right).  (PSSUF 2; Romero Decl.

---

[1] The following relevant facts come primarily from Plaintiff's Complaint ("Compl.," Doc. 1-1); the parties' Joint Statement of Undisputed Facts ("JSUF," Doc. 47-3) and the evidence cited therein; Defendants' Separate Statement of Undisputed Material Facts ("DSSUF," Doc. 47-2); Plaintiff's Separate Statement of Undisputed Facts ("PSSUF," Doc. 55); the video recording of a police interrogation of Plaintiff by MPD Officer Daniel Foss ("Foss Interrogation Video," Doc. 56-5 (manually filed)) and the excerpts of the transcription of that recording ("Foss Interrogation Tr.," Docs. 47-17 & 55-3); Plaintiff's Declaration ("Romero Decl.," Doc. 55-1) and excerpts of Plaintiff's deposition ("Romero Dep.," Docs. 47-4, 55-2, & 56-4); excerpts of the Reporter's Transcript of Preliminary Hearing Examination in *People v. David Romero*, Madera County Superior Court, Case No. MCR045397 ("Prelim. Hr'g Tr.," Docs. 47-6, 54-2, 54-3, & 55-4); Defendant Yates' Declaration ("Yates Decl.," Doc. 47-21); excerpts of the Depositions of CHP Officer Christopher Lancaster ("Lancaster Dep.," Docs. 47-10 & 55-8) and CHP Officer Javier Ruvalcaba ("Ruvalcaba Dep.," Docs. 47-14 & 55-7); redacted CHP Form 216 Arrest – Investigation Report Narrative ("CHP Report," Doc. 47-11); Defendant Jimenez's Declaration ("Jimenez Decl.," Doc. 47-22) and excerpts of Defendant Jimenez's deposition ("Jimenez Dep.," Docs. 47-12, 55-6, & 56-7); redacted Madera Police Department Arrest – Incident Report ("MPD Report," Doc. 47-15); Declaration of Kevin Dunivan ("Dunivan Decl.," Doc. 55-5) and the Supplemental Declaration of Kevin Dunivan ("Supp. Dunivan Decl.," Doc. 56-2); Criminal Information filed in *People v. David Romero*, Madera County Superior Court, Case No. MCR045397 ("Crim. Info.," Doc. 47-18); and Minute Order dismissing charges ("Min. Ord.," Doc. 47-19).

[2] Defendants have submitted with their reply objections to certain of Plaintiff's evidence (*see* Doc. 56-1), which the Court has carefully reviewed.  To the extent the Court necessarily relied on evidence to which Defendants objected, the Court relied only on admissible evidence and, therefore, the objection is OVERRULED.  It is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment, unless otherwise noted.  *See Kong Meng Xiong v. City of Merced*, No. 1:13-CV-00083-SKO, 2015 WL 4598861, at *1 (E.D. Cal. July 29, 2015); *Morgutia-Johnson v. Hustedde*, No. 1:14-CV-127-LJO-SKO, 2015 WL 1892904, at *1 (E.D. Cal. Apr. 24, 2015) ("Because the Court will consider only admissible and competent evidence, the Court need not rule on Plaintiff's objections prior to resolving Defendants' motion for summary judgment.").

1    at ¶ 6.)  Plaintiff observed Defendant Yates' SUV close to the rear bumper of his truck.  (Romero

2    Decl. at ¶ 6.)  Plaintiff contends that whenever Plaintiff would slow down, Defendant Yates would

3    slow down, and whenever Plaintiff would speed up, Defendant Yates would speed up.   (MPD

4    Report at 8.)

5           Proceeding south on Schnoor Avenue from Cleveland Avenue to Riverside Avenue there

6    are two stop signs, one located at Dutra Avenue and one located at Riverview/Jefferson Avenue.

7    (PSSUF 1; Prelim. Hr'g Tr. at 184:5–187:13.)  Plaintiff (still in the number 1 lane) and Defendant

8    Yates and Mrs. Yates (still in the number 2 lane) arrived at the stop sign at Dutra and Schnoor

9    Avenues at the same time as each other.  (PSSUF 2; Romero Decl. at ¶ 6.)  Plaintiff contends that

10   at the stop sign at Dutra Avenue, Defendant Yates began to yell in his direction.  (Romero Decl. at

11   ¶6.)

12          According to Defendant Yates, Plaintiff ran the stop sign at Dutra Avenue, which Plaintiff

13   denies.  (DSSUF 1; Prelim. Hr'g Tr. at 181:1–4; PSSUF 5; Romero Decl. at ¶ 3.)  Mrs. Yates

14   testified that that she saw Plaintiff "pull up" to the stop sign in the number 1 lane, that Plaintiff

15   said something to Defendant Yates, but that she could not hear what was said because the

16   windows of the SUV were rolled up.  (Prelim. Hr'g Tr. at 79:2–80:15.)  Mrs. Yates testified that

17   both vehicles were at the stop sign at Dutra Avenue, and that their SUV left the stop sign before

18   Plaintiff's vehicle.  (*Id.* at 81:13–24.)

19
     **B.     The Parties Travel South on Schnoor Avenue Toward the Intersection at Riverview
20            Drive/Jefferson Avenue, When Plaintiff Allegedly Points a Gun at Defendant Yates
             and Mrs. Yates.**
21

22          Defendant Yates testified that as the two vehicles traveled southbound on Schnoor Avenue,

23   they entered a bridge, at which point Plaintiff moved his truck into the number one lane and

24   decelerated, positioning himself next to Defendant Yates' SUV.  (Prelim. Hr'g Tr. at 181:10–

25   182:14.)  Defendant Yates testified that Plaintiff was looking at him and pointing with his right

26   hand, and appeared to be yelling something or motioning in some way.   (*Id.* at 182:17–23.)

27   Defendant Yates testified that Plaintiff's truck then "violently jumped" in the direction of

28   Defendant Yates' SUV, causing Defendant Yates to swerve to the right.  (DSSUF 1; Prelim. Hr'g

1   Tr. at 182:25–183:14; MPD Report at 10.)  According to Defendant Yates, Plaintiff's truck then

2   moved back behind Defendant Yates' SUV and the two vehicles continued southbound on

3   Schnoor Avenue. (Prelim. Hr'g Tr. at 183:19–184:4.)

4   The two southbound lanes of Schnoor Avenue merge into a single southbound lane in the

5   area of the bridge north of the intersection of Schnoor and Riverview Drive (eastbound)/Jefferson

6   Avenue (westbound).  (PSSUF 6; Prelim. Hr'g Tr. at 183:22–184:1.)  Defendants Yates testified

7   that as he and Plaintiff were traveling on the bridge and slowing toward another stop sign at

8   Schnoor and Riverview/Jefferson, Plaintiff got into the northbound lane (going in the opposite

9   direction) and pulled his truck up alongside Defendant Yates' SUV. (DSSUF 2; Prelim. Hr'g Tr.

10  at 186:2–187:13)

11  According to Defendant Yates, as Plaintiff pulled his truck alongside the SUV heading

12  toward the stop sign at Schnoor and Jefferson/Riverview Avenues, Defendant Yates put his

13  window down to tell Plaintiff "to knock it off."  (Prelim. Hr'g Tr. at 188:26–189:3, 189:17–26.)

14  Defendant Yates testified that he saw Plaintiff point a gun toward Defendant Yates and Mrs.

15  Yates, and that he heard Plaintiff yell out the window, "What's up, what's up now, bro?"  (DSSUF

16  3; Prelim. Hr'g Tr. 188:5–189:11.)  Mrs. Yates testified that she did not see a gun at that time,

17  only that Defendant Yates had told her that he saw a gun.  (*Id*. at 90:10–24.)

18  In his declaration, Plaintiff denies pointing a firearm of any kind at Defendant Yates or

19  Mrs. Yates.  (Romero Decl. at ¶ 5.)  According to Plaintiff, he stopped at the stop sign at Schnoor

20  and Riverview/Jefferson, with his driver's side window down, at which point Defendant Yates'

21  SUV pulled alongside Plaintiff to the right (in the right-turn lane) and began yelling at him again

22  and pointing.  (*Id.* at ¶ 6; Romero Dep. at 45:5–46:14.)  Plaintiff testified in his deposition that that

23  was the first time he saw Defendant Yates.  (Romero Dep. at 39:25–40:11.)  According to

24  Plaintiff, he then "flipped off" (displayed his middle finger at) Defendant Yates and continued

25  proceeding southbound on Schnoor Avenue, toward his home approximately five blocks away.

26  (Romero Decl. at ¶ 6; Romero Dep. at 47:25–48:12; MPD Report at 8.)

27  **C.      Mrs. Yates Calls 911.**

28  According to Defendant Yates, after Plaintiff pointed the gun towards him, Defendant

4

1    Yates slammed on the brakes and came to a complete stop and instructed his wife to call 911
2    because he "feared for [their] safety," at which point Plaintiff's truck moved in front of Defendant
3    Yates' SUV.  (Prelim. Hr'g Tr. 91:18–23, 189:9–11; Yates Decl. at ¶ 2.)  Mrs. Yates then called
4    911 from her cell phone, and the call was routed to CHP's central division dispatch.  (JSUF 6.)

5    Mrs. Yates reported to the 911 dispatcher that a Hispanic male with a goatee (later
6    identified to be Plaintiff) is driving a silver Dodge truck and that he is pointing a silver gun at
7    them.  (JSUF 7.)  During the 911 call Mrs. Yates also identified her husband, Defendant Yates, as
8    an off duty CHP officer and advised that he also has a gun.  (JSUF 8.)  When asked why
9    Defendant Yates and Mrs. Yates are following Plaintiff, Mrs. Yates responded "because he
10   pointed a gun at us."  (JSUF 9.)  Defendant Yates denies "stalk[ing]" Plaintiff, and states that he
11   continued to follow Plaintiff is accordance with his training to keep an armed suspect in front of
12   you within sight to avoid getting shot from behind.  (JSUF 10; Yates Decl. at ¶ 3.)

13   Mrs. Yates then told CHP dispatch, who conferenced Madera Police Department's
14   ("MPD") dispatch into the call, that they are continuing to follow Plaintiff, and she provided the
15   various directions and locations in which they were headed.  (JSUF 11.)  When MPD dispatch
16   asked what Mrs. Yates needed, Mrs. Yates responded "we just need somebody to get here quick."
17   (JSUF 12.)  During the call, Defendant Yates was heard telling Mrs. Yates that Plaintiff has a
18   "black semi-automatic" handgun, which Mrs. Yates relayed to dispatch.  (JSUF 13; PSSUF 7;
19   Prelim. Hr'g Tr. at 188:14–19.)  When asked if there had been an accident, Mrs. Yates responded
20   "No," but stated that Plaintiff was acting with road rage, that he has a gun, and that Defendant
21   Yates does not want to lose him.  (JSUF 14.)

22   **D.    Defendant Yates Continues to Follow Plaintiff on Schnoor Avenue to Fillmore
23          Avenue.**

24   Plaintiff states that, to his surprise, instead of turning right on Riverview Avenue,
25   Defendant Yates' SUV went south on Schnoor Avenue and appeared to be following Plaintiff,
26   following close to his bumper.  (Romero Decl. at ¶ 6; Romero Dep. at 58:3–6)  Upon seeing the
27   SUV following him, Plaintiff turned left (east) on Fillmore Avenue and, shortly after making the
28   turn, stopped his truck next to the south curb to allow the SUV to pass.  (Romero Decl. ¶ 6;

Prelim. Hr'g Tr. at 193:4–21; MPD Report at 6, 8.)  Instead of passing Plaintiff, Defendant Yates'

positioned his SUV behind Plaintiff's truck and, according to Plaintiff, turned its "high beam"

headlights on Plaintiff's truck.  (Romero Decl. at ¶ 6; Prelim. Hr'g Tr. at 122:15–26)   When

interviewed by Officer Daniel Foss of MPD, Defendant Yates said that he never identified himself

as law enforcement during the time he was following Plaintiff.  (Prelim. Hr'g Tr. at 122:9–14.)

Defendant Yates testified that even though he was not intending to drive down Fillmore Avenue,

he followed Plaintiff because he "wasn't going to let him get in a position where he could shoot

us." (Prelim. Hr'g Tr. at 193:15–25.)

**E.**    **Plaintiff Allegedly Points a Gun at Defendant Yates, and Defendant Yates Fires Six Shots at Plaintiff.**

After waiting a period of time pulled over on Fillmore Avenue, Plaintiff decided to

continue home.  (Romero Decl. at ¶ 6.)  According to Plaintiff, he pulled his truck from the curb

and proceeded to the end of the block, where Fillmore Avenue ends into Orchard Avenue, forcing

a left or right turn.  (*Id.*)  Because Plaintiff's home is south of Fillmore Avenue, he made a right

turn at the intersection of Fillmore and Orchard Avenues.   (*Id.*)   After Plaintiff turned onto

southbound Orchard Avenue, he pulled his truck to the west side curb on Orchard Avenue,

approximately one-half block north of the intersection of Orchard and University Avenues.

(Romero Decl. at ¶ 6; MPD Report at 9–10.)  To Plaintiff's surprise, Defendant Yates followed

Plaintiff and stopped his vehicle on Orchard Avenue a distance behind Plaintiff's vehicle, which

had stopped in the parking strip on southbound Orchard Avenue, only blocks away from

Plaintiff's home on University Avenue.  (JSUF 16; Romero Decl. at ¶ 6; MPD Report at 9–10.)

Plaintiff contends that once again Defendant Yates shined his high beams on Plaintiff's

truck.  (Romero Decl. at ¶ 6.)  Concerned that the SUV may follow him to his home, Plaintiff

decided to make a U-turn at the intersection of University and Orchard Avenues, traveling away

from Plaintiff's home.  (Romero Decl. at ¶ 6; Romero Dep. at 58:21–59:8.)  According to Plaintiff,

because this was the second time that the SUV followed his truck and parked behind him with its

high beams on his vehicle, he became concerned for his safety.  (Romero Decl. at ¶ 6; Romero

Dep. at 58:21–59:8.)  Plaintiff contends that before he pulled away from the curb on Orchard

1   Avenue, he "removed [his] .40 caliber Smith & Wesson firearm from the glove compartment of

2   [his] truck and [he] placed it on the passenger seat." (Romero Decl. at ¶ 6; Romero Dep. at 59:9–

3   60:12, 63:18–64:24.) According to Plaintiff, as he pulled away from the curb, he "held [his] hand,

4   opened palm, over the firearm while it laid [sic] on the passenger seat." (Romero Decl. at ¶ 6;

5   Romero Dep. at 59:9–25.) Plaintiff testified that he placed the gun there "just in case [Defendant

6   Yates] did get out with some kind of weapon — or you know, I'm thinking, this guy's crazy . . . I

7   pulled it out just for my safety." (Romero Dep. at 65:12–66:1.)

8          Plaintiff proceeded to the intersection of Orchard and University Avenues and began to

9   make the U-turn to go from southbound Orchard Avenue to northbound Orchard Avenue in order

10  to get away from Defendant Yates. (Romero Decl. at ¶ 6; Romero Dep. at 59:9–25.) Defendant

11  Yates testified that at this point he observed Plaintiff waving a gun, in his right hand across his

12  body, out his driver's side window. (Prelim. Hr'g Tr. at 239:13–240:11, 243:9–244:7.) As

13  Plaintiff accelerated, Defendant Yates believed that Plaintiff was not "trying to get away," and

14  instead was "coming back to kill us." (*Id.* at 239:18–240:1.) Mrs. Yates is then heard on the 911

15  call yelling out "No! No! He's got a gun! He's got a gun!" (JSUF 17.) Officer Yates is heard

16  telling Mrs. Yates to "Get on the floor, now!" (JSUF 18.)

17         According to Plaintiff, before he could complete the U-turn, Defendant Yates' SUV darted

18  from the southbound lane, crossed over into the northbound lane facing what would be oncoming

19  traffic, cutting off his ability to complete the U-turn and his attempt to get away from the SUV.

20  (Romero Decl. at ¶6; Foss Interrogation Tr. at 26:1–6.) Defendant Yates testified that he moved

21  his SUV to "stop[] [Plaintiff] from being able to get side by side with us by turning in towards his

22  vehicle." (Prelim. Hr'g Tr. at 242:8–16.) Plaintiff stated that when the SUV blocked his truck,

23  Defendant Yates "jumped out to [sic] the SUV and began shooting at me while I sat in my truck

24  having had my route blocked." (Romero Decl. at ¶ 6.) Defendant Yates fired six shots from his

25  gun, and took the shots either through the wedge of the SUV's door and SUV itself or the driver's

26  side window, which was down. (JSUF 19; Prelim. Hr'g Tr. at 244:8–25.) Plaintiff testified that

27  the majority of the rounds came in from the driver's side, close to where the side and front

28  windows meet. (Romero Dep. at 71:12–25.) Officer Foss, who interviewed both Plaintiff and

7

1   Defendant at the scene, testified that some of the shots went through the driver's side headrest,

2   where Plaintiff's head would have been had he not ducked down.  (Prelim. Hr'g Tr. 121:3–12.)

3   One of the bullets grazed Plaintiff's left index finger, but he had no other injuries from the

4   shooting.  (JSUF 20.)  Plaintiff testified that Defendant Yates did not say anything or make any

5   gestures as he got out of the SUV to fire his weapon.  (Romero Dep. at 70:2–10.)

6       Plaintiff in his declaration states that "[a]t no time did I ever point, show, direct my firearm

7   at the SUV or any other person.  My firearm remained on the passenger seat with my open hand

8   covering the firearm until the firearm fell onto the passenger side floor board."  (Romero Decl. at ¶

9   6.)  In Plaintiff's deposition, he testified that he did not pick up his weapon or point the gun at

10  Defendant Yates.  (Romero Dep. at 71:5–11; 73:8–10.)

11      Kevin Dunivan, who was visiting his mother on Orchard Avenue the night of the incident,

12  stated that he was sitting outside his mother's house in the driver's seat of his truck parked "next

13  to the eastside curb facing north with a direct and unobstructed view through the front windshield

14  of the intersection" of Orchard and University Avenues.  (Dunivan Decl. at ¶ 3.)  Mr. Dunivan

15  observed a silver pickup begin a U-turn movement at the intersection, and, as the truck was

16  completing its turn to begin to proceed north on Orchard, observed a dark colored SUV approach

17  the intersection driving southbound on Orchard.  (*Id.* at ¶¶ 4–5.)  Mr. Dunivan stated that the SUV

18  "suddenly...crossed into the northbound lane" of Orchard just north of the intersection, and the

19  driver of the SUV "positioned the SUV at an angle" across the northbound lane of Orchard

20  Avenue, blocking the travel of the pickup.  (*Id.* at ¶ 5.)  According to Mr. Dunivan, he:

21
22          never saw any person in the silver pickup point, hold, or display any firearm of
            any type.  I did not see the pickup take any aggressive action toward the dark
23          colored SUV or any person in the area of this incident and the only action I
            observed by the silver pickup to attempt to make a U-turn in the intersection of
24          Orchard Street [sic] and University Avenue.

25  (*Id.* at ¶ 7.)  Mr. Dunivan submitted a supplemental declaration, in which he "clarif[ied]" that

26  while he did not see Plaintiff point his gun outside the window of his truck, he

27          was not able to see inside the silver truck driven by Mr. Romero either. It was
            dark and I was seated in my vehicle almost 50 feet away from where the truck and
28          the black SUV were stopped.  From my vantage point that evening, I could not

1    see, nor could I have seen, whether Mr. Romero in the truck had pointed his
2    weapon inside his truck at the driver of the black SUV, and I do not know if he
     did or did not.

3    (Supp. Dunivan Decl. at ¶ 3.)

4    **F.    Plaintiff is Punched by Defendant Jimenez, Handcuffed by CHP officers, and Taken**
5    **Into Custody.**

6        The entire incident (from the start of the 911 call to sounds of gun shots) lasted

7    approximately 6 minutes.  (JSUF 22.)  Less than two minutes later, the sirens from CHP Officers

8    Javier Ruvalcaba's and Chris Lancaster's patrol vehicles could be heard over Mrs. Yates' 911 call

9    with dispatch.  (JSUF 23.)  A male's voice shouting undecipherable instructions can also be heard

10   on the 911 call shortly after the sirens stop.  (JSUF 24.)

11       When Mrs. Yates initially made the 911 call, CHP dispatch announced over air that there

12   was a brandishing.  (JSUF 25.)  Officers Lancaster and Ruvalcaba and Defendant Jimenez were all

13   working when they heard a broadcast over the CHP dispatch that a CHP Officer's wife had

14   reported a brandishing.  (JSUF 26.)  They drove to the identified location of the brandishing in

15   their patrol cars—Officer Ruvalcaba driving Defendant Jimenez in one, and Officer Lancaster

16   driving separately in another.  (JSUF 27.)  While en route to the location of the brandishing,

17   dispatch informed the officers that there was a shooting and that an off-duty CHP officer was

18   involved.  (JSUF 28.)

19       The Mobile Video/Audio Recording System ("MVARS") on Officer Lancaster's patrol car

20   shows him following Officer Ruvalcaba's patrol car, which had its lights activated as he

21   approached the scene of the shooting.  (JSUF 29.)  Defendant Yates and his wife were standing

22   behind their SUV when Officers Lancaster, Ruvalcaba and Defendant Jimenez arrived.  (JSUF

23   30.)  After exiting their patrol cars, Officers Lancaster, Ruvalcaba, and Defendant Jimenez drew

24   their weapons and circled around the SUV, disappearing behind it in the direction of Plaintiff's

25   truck (which was blocked from the MVARS view behind the SUV).  (JSUF 31.)

26       Plaintiff testified that he heard the officers direct him to put his hands up, at which point he

27   left the gun on the floorboard, where he had thrown it, and sat up.  (Romero Dep. at 75:4–9.)  An

28   incident report prepared by Officer Ruvalcaba stated that he "began to give verbal commands to

9

1  the driver and instructed [Plaintiff] to put his hands up," but Plaintiff "did not follow orders and

2  only his left hand was visible.  (CHP Report at 3.)  Officer Ruvalcaba testified at his deposition

3  that he instructed Plaintiff to "show me your hands," that he could see one hand but "wasn't sure

4  what was happening with the other hand . . . perhaps it was the angle where I was at, I don't

5  know."  (Ruvalcaba Dep. at 23:13–19.)  He testified that when he came upon the driver's side

6  window, he looked in and saw both of Plaintiff's hands "a little bit above his shoulders."  (*Id.* at

7  22:7–23:4.)  Defendant Jimenez testified that he could see Plaintiff holding both hands "about face

8  high" and that his hands were bleeding, but Defendant Jimenez didn't believe Plaintiff's injury

9  would impair his ability to follow Defendant Jimenez's commands.  (Jimenez Dep. at 24:8–27:7.)

10       As they approached Plaintiff's truck, Defendant Jimenez saw a gun lying on the floorboard

11  on the passenger side, close to the central console, and yelled out "Gun!".  (JSUF 32.)  Officer

12  Lancaster testified that when Defendant Jimenez called out "Gun!", he could see both of

13  Plaintiff's hands, neither of which held a gun, and that Plaintiff was not moving in any way.

14  (Lancaster Dep. at 23:18–24:17, 25:2–12.)  Officer Ruvalcaba also testified that he did not see

15  Plaintiff make any movements at that time.  (Ruvalcaba Dep. at 26:20–27:3.)

16       Officer Ruvalcaba found Plaintiff in his truck with the driver's side window closed.  (JSUF

17  33.)  The CHP officers ordered Plaintiff to unlock the doors, but Plaintiff did not comply.  (JSUF

18  34.)  Officer Lancaster broke the passenger window with his ASP baton and unlocked the door as

19  Defendant Jimenez came around to the driver's side and opened the driver side door. (JSUF 35.)

20  As soon as Defendant Jimenez opened the driver side door, Plaintiff's truck, which had an

21  automatic transmission, started rolling forward at least 15 feet. (JSUF 36, 37.)  Officer Ruvalcaba

22  testified that he never saw Plaintiff put his hands on the steering wheel or on the gear shifter.

23  (Ruvalcaba Dep. at 26:20–24, 28:19–25.)

24       Seeing the truck move as soon as he opened the door, Defendant Jimenez believed Plaintiff

25  was trying to escape or that he would use his truck as a weapon.  (JSUF 38.)  Defendant Jimenez

26  punched Plaintiff's once in his cheek to distract him so that Defendant Jimenez could reach into

27  the gear shift on the steering wheel and put the transmission into park.  (JSUF 39.)  Defendant

28  Jimenez testified at his deposition that he did not know whether Plaintiff "hit the accelerator or

1    not." (Jimenez Dep. at 19:11–14; 31:21–24.)  Defendant Jimenez grabbed Plaintiff, pulled him

2    towards him, and locked him in place so that Plaintiff could not reach for his gun.  (JSUF 40.)

3    Defendant Jimenez believed he "had to distract Plaintiff long enough that [he] could reach into the

4    truck and put the transmission into park," and that in his training "use of distraction punch under

5    these circumstances in reasonable and necessary, and that is why [he] punched Plaintiff once on

6    the cheek." (Jimenez Decl. at ¶ 3.)

7         Defendant Jimenez reached around Plaintiff and put the transmission in park with his right

8    hand, at which point the transmission started to grind.  (JSUF 41.)  Once the truck was parked,

9    Plaintiff did not exit the vehicle despite being instructed to do so by the officers.  (JSUF 42.)

10   According to Plaintiff, the next thing he felt was a CHP Officer grabbing his neck in a headlock

11   position and trying to pull Plaintiff out the driver's side window.  (Romero Dep. at 75:10–14.)

12   Plaintiff testified he felt another CHP Officer put him in a "choke hold" and hit him in his cheeks

13   as he tried to unhook his seat belt.  (*Id*. at 75:16–76:4.)  According to Plaintiff, the officer hitting

14   him told him to "Quit resisting."  (*Id*. at 75:17–22, 82:23–83:3.)

15        Defendant Jimenez testified that after he put the vehicle in park, he released Plaintiff's

16   seatbelt. (Jimenez Dep. at 37:22–25.)  Plaintiff was then pulled from the vehicle and placed on the

17   ground, head first, and his cheeks were scraped on the asphalt as Plaintiff tried to push his head up

18   from the ground, to avoid getting pushed into it.  (JSUF 43;CHP Report at 4; Romero Dep. at

19   87:25–88:6; Lancaster Dep. at 44:21–25; Ruvalcaba Dep. at 33:15–24.)   Defendant Jimenez

20   testified that Plaintiff's "road rash" was caused "partially from myself" pulling Plaintiff from the

21   truck and "forcing him to the ground," and also from Plaintiff "flinging around, moving his face as

22   we were trying to hold him down." (Jimenez Dep. at 44:1–45:1.)  Officers Lancaster, Ruvalcaba,

23   and Defendant Jimenez then tried to hold Plaintiff still to place handcuffs on his wrists, but

24   Plaintiff straightened out his arms making it difficult for the officers to do so.  (JSUF 44; Romero

25   Dep. at 88:12–22.)  Officer Ruvalcaba believed Plaintiff was "resisting being handcuffed" because

26   the officers were using "extreme force to bring [Plaintiff's] hands to his back and he was told

27   several times, 'Give me your hands.  Give me your hands.'"  (Ruvalcaba Dep. at 33:1–7.)

28   Defendant Jimenez testified that Plaintiff "wasn't physically resisting" being handcuffed but he

1  "tightened up." (Jimenez Dep. at 42:3–8.)  Officer Lancaster testified that Plaintiff was lying on

2  his hands with his hands underneath him when he was being handcuffed.  (Lancaster Dep. at 31:5–

3  15.)  According to Officers Lancaster and Ruvalcaba, Plaintiff did not punch, kick, or bite the

4  officers.  (Lancaster Dep. at 44:10–20; Ruvalcaba Dep. at 26:25–27:3.)

5  **G.       MPD Officer Lori Alva Interviews Plaintiff and Defendant Yates at the Scene.**

6          One or two minutes after Plaintiff was placed in handcuffs, MPD Officer Lori Alva arrived

7  on scene.  (JSUF 45.)  Officer Alva then took a recorded interview of Plaintiff and summarized

8  that statement in a "narrative report."  (JSUF 48; MPD Report at 6.)  She had been advised by

9  Officer Ruvalcaba that Plaintiff "did not comply with any of his commands and was

10  uncooperative." (MPD Report at 5.)  Officer Alva observed blood and scrapes on both sides of his

11  face and blood on Plaintiff's shirt and hands.  (*Id.*)

12          Plaintiff told Officer Alva he "did not know why this 'Asshole' driver was following him"

13  and that Plaintiff felt threatened.  (*Id*. at 6.)  Plaintiff stated that when he made a U-turn to get

14  away Defendant Yates, Defendant Yates "cut him off" by pulling in front of him.  (*Id.*)  Plaintiff

15  felt "endangered" and pointed his firearm at Defendant Yates: "I pointed my firearm at him

16  because he cut me off."  (*Id.*)  Plaintiff stated to Officer Alva at least four different times that he

17  pulled out his weapon and pointed it at Defendant Yates when Defendant Yates blocked him with

18  his SUV.  (JSUF 49.)  A black Smith & Wesson semi-automatic handgun was recovered from

19  Plaintiff's truck following his arrest.  (JSUF 21.)

20          Officer Alva also interviewed Defendant Yates and took his gun at the scene.  (JSUF 46.)

21  Officer Alva summarized Defendant Yates' statement in a "narrative report."  (MPD Report at 6–

22  7.)  Defendant Yates told Officer Alva that as he was making a left turn onto Schnoor Avenue

23  from Cleveland Avenue he was "cut off" by Plaintiff.  (*Id.*)  Defendant Yates "thought [Plaintiff]

24  was drunk because [Plaintiff] was also stopped at a stop sign but was positioned approximately

25  two car lengths from the limit line and did not move."  (*Id.* at 7.)  Defendant Yates continued to

26  follow [Plaintiff] south bound onto Schnoor Ave. "to observe his driving."  (*Id.*)  Defendant Yates

27  told Officer Alva that when they approached Dutra Way, Defendant Yates pulled alongside

28  Plaintiff and yelled something to him.  (*Id.*)  Plaintiff "flipped him off and then pointed a gun at

[Defendant Yates]." (*Id.*)  Defendant Yates advised Officer Alva that Plaintiff brandished a gun and pointed it at Defendant Yates and his wife just before the shooting, and that Defendant Yates was forced to fire at Plaintiff in self-defense and to protect his wife.  (JSUF 47.)

**H.      MPD Officer Foss Interviews Plaintiff, Defendant Yates, and Mrs. Yates.**

That night at the MPD station, Plaintiff was questioned by Officer Daniel Foss, which was video recorded.  (*See* Foss Interrogation Video.)  Plaintiff told Officer Foss that Defendant Yates yelled something to him at the stop sign at Dutra Avenue, but that Plaintiff could not hear him.  (Foss Interrogation Tr. at 19:6–20; Prelim. Hr'g Tr. at 101:2–15.)    Plaintiff characterized Defendant Yates' driving as "aggressive" and did not know why the SUV was behaving in that way.  (Prelim. Hr'g Tr. at 102:19–25.)

Plaintiff told Officer Foss that when Defendant Yates cut him off at Orchard and University Avenues, he had "pulled [his gun] out":

> A. Yeah. When I come around the corner -- or excuse me.  When I made the U-turn, um, I had it out for protection, of course.  But like I said, I didn't know who this was dude.
>
> Q. I understand.
>
> A. So, yeah, I had it out. I mean, I didn't point it until I found out –
>
> Q. Did you hold it up so he could see it?
>
> A. I was holding it like this; right? And when he came up, that's when he started firing at me, and I went down.
>
> Q. So you had it out pointing like this (indicating)?
>
> A. ·I don't remember if I had it I don't know if I was going to take a shot, you know. I was hoping -- I don't know what.  I just had it ready to do whatever. I didn't know what (INAUDIBLE).  Especially when he cut me off, what the hell this person was.
>
> Q. Okay. Were you thinking that you might have to shoot this guy?

1

> A. Yeah. Yeah, especially the second time, he went -- like I said, he wouldn't
> leave. Whatever –

2

(Foss Interrogation Tr. at 26:15–27:17.)  As Plaintiff responds "I was holding it like this…," the

3

video shows Plaintiff holding his hand up near his face with his index finger extended and thumb

4

pointed upwards.  (*See* Foss Interrogation Video at 22:30:59.375–22:31:51:500 (time stamp).)

5

Officer Foss's report of his interview with Plaintiff states that as he made the U-turn at the

6

intersection of Orchard and University Avenues, Plaintiff

7

8

> had his handgun at his hand at this time, and he showed me how he was holding
> it.  [Plaintiff] made a gun shape with his hand and held it up by his face as if he
> was aiming it.  I asked [Plaintiff] if he point [sic] the gun at [Defendant] Yates
> and he advised that he could not remember, but he thinks he may have.  I asked
> him why he would point his gun at [Defendant] Yates and he stated that he
> thought he "May have to shoot this guy."

9

10

11

(MPD Report at 9.)  Plaintiff admitted that he never thought to call the police when Defendant

12

Yates followed him.  (JSUF 50.)

13

After speaking with Plaintiff, Officer Foss interviewed Defendant Yates.  (MPD Report at

14

10–11.)  According to Officer Foss's report, Defendant Yates told him that he was in the left turn

15

lane to turn south onto Schnoor Avenue when Plaintiff cut in front of him and stopped "several

16

yards from the limit line of the intersection, at an odd angle, with no other vehicles or obstructions

17

in front of him."  (*Id.* at 10.)  Defendant Yates believed Plaintiff was intoxicated, based on his

18

observations.  (*Id.*)

19

Defendant Yates then told Officer Foss that Plaintiff "swerved his truck into [Defendant

20

Yates'] lane as if [Plaintiff] was going to ram him."  (*Id.*)  Defendant Yates reported that he rolled

21

down his window to say something to Plaintiff.  (*Id.*)  Plaintiff slowed down his truck so that he

22

and Defendant Yates' SUV were parallel to each other, and Defendant Yates told Officer Foss that

23

when he looked over to say something to Plaintiff, he "saw that [Plaintiff] was pointing a large

24

handgun directly at him."  (*Id.*)  While his wife was calling 911, Defendant Yates followed

25

Plaintiff and "tried to stay behind him in the safest manner possible."  (*Id.*)

26

Defendant Yates reported to Officer Foss that Plaintiff ultimately parked on Orchard Street

27

and Defendant Yates parked behind him.  Defendant Yates observed Plaintiff drive away from the

28

location as if to turn west onto University Avenue, then "abruptly turned" in order to make a U-turn.  (*Id.*)  Defendant Yates told Officer Foss that "[a]s soon as [Plaintiff] started making the [U]-turn [Defendant] Yates saw that he was holding the handgun and was pointing it directly at [Defendant] Yates."  (*Id.* at 11.)  Defendant Yates told Officer Foss he did not recall how his vehicle became positioned where it was, but that he "quickly opened the door and fired at [Plaintiff]" because he "believed that [Plaintiff] was going to try and kill him."  (*Id.*)

Mrs. Yates "corroborated [Defendant] Yates' statement," but could only remember Plaintiff and Defendant Yates stopping one time prior to the shooting.  (*Id.*)  She also told Officer Foss that "did not see the handgun in [Plaintiff's] hand during the first incident when [Defendant] Yates saw it."  (*Id.*)  Officer Foss testified that he interviewed Mrs. Yates, and that she never saw a gun in Plaintiff's possession.  (Prelim. Hr'g Tr. at 109:16–12.)

### III.        PROCEDURAL BACKGROUND

Madera County Police Department arrested Plaintiff for violating Penal Code section 417.3, felony brandishing.  (JSUF 51.)  Madera County District Attorney's Office found no criminal liability on Defendant Yates' part.  (JSUF 53.)

On February 10, 2014, Plaintiff filed his Complaint in the Superior Court of the State of California, County of Madera, against CHP Officers Yates, Jimenez, Lancaster, and Ruvalcaba.  (*See* Compl.)  Defendants removed the case to this Court on the basis of federal question jurisdiction, pursuant to 28 U.S.C. § 1331, on July 3, 2014.  (Doc. 1.)  That same day, the Madera County District Attorney charged Plaintiff with two counts of brandishing.  (JUSF 51; Crim. Info.)

On August 22, 2014, Defendants filed a motion to stay this case pending the outcome of Plaintiff's state court criminal proceedings, which the Court granted.  (Doc. 18.)  On July 7, 2015, the Madera County Superior Court granted the District Attorney's motion to dismiss the brandishing charges without prejudice.  (JSUF 52; Min. Ord.)  On August 21, 2015, the parties advised the Court that Plaintiff's underlying criminal matter had been dismissed without prejudice (Doc. 34), and the Court lifted the stay on August 25, 2015.  (Doc. 35.)

On March 17, 2017, the Court dismissed with prejudice Plaintiff's claim arising under 42 U.S.C. § 1983 for violations of his First, Fifth and Fourteenth Amendment rights and all claims

against Defendants Lancaster and Ruvalcaba.  (Doc. 46.)  Plaintiff currently advances a cause of action under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment against Defendant Yates and Jimenez, and state law causes of action for battery against Defendant Yates and Jimenez, for assault against Defendant Yates, and for negligence against Defendant Yates.

On April 17, 2017, Defendants moved for summary judgment on all of Plaintiff's claims. (Doc. 47.)  Plaintiff filed a brief in opposition, and Defendants filed a reply brief.  (Docs. 54 & 56.)  Plaintiff asserts there are multiple issues of material fact that preclude summary judgment, including whether Plaintiff brandished a gun at Defendant Yates and whether Defendant Jimenez used excessive force arresting Plaintiff.

## IV.     SUMMARY JUDGMENT/ADJUDICATION LEGAL STANDARD

Summary judgment/adjudication is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party."  *Id.*  (internal quotation marks and citation omitted).

The party seeking summary judgment/adjudication "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment/adjudication is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party."  *Id.*  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail

1  merely by pointing out that there is an absence of evidence to support the nonmoving party's

2  case." *Id.* (citing *Celotex*, 477 U.S. at 323).

3      If the movant satisfies its initial burden, the nonmoving party must go beyond the

4  allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative

5  evidence from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th

6  Cir. 2009). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect. *Id.*

7  at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

8  (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do

9  more than simply show that there is some metaphysical doubt as to the material facts."). "Where

10  the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

11  there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

12      In resolving a summary judgment/adjudication motion, "the court does not make

13  credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That

14  remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he

15  evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn

16  in [its] favor." *Id.* Inferences, however, are not drawn out of the air; the nonmoving party must

17  produce a factual predicate from which the inference may reasonably be drawn. *See Richards v.*

18  *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir.

19  1987).

20                        **V.       DISCUSSION**

21  **A.     Plaintiff's Fourth Amendment Claims Against Defendants Yates and Jimenez**

22      Plaintiff alleges excessive force claims under the Fourth Amendment pursuant to 42 U.S.C.

23  § 1983. Defendants claim they are entitled to summary judgment as to this claim because both

24  Defendant Yates and Defendant Jimenez acted reasonably under the circumstances.

25      Title 42 U.S.C. Section 1983 provides a cause of action for the deprivation of "rights,

26  privileges, or immunities secured by the Constitution or laws of the United States" by any person

27  acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446

28  U.S. 635, 639 (1980). Section 1983 is not itself a source of substantive rights, but instead is a

method for vindicating federal rights conferred elsewhere.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).   A claim under Section 1983 requires an allegation that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

> **1.      There Are Disputed Issues of Material Fact Regarding Plaintiff's Claim for Excessive Force Against Defendant Yates.**

Plaintiff claims that Defendant Yates' decision to shoot him was unreasonable in violation of his Fourth Amendment rights.  (Compl. at ¶¶ 26–30.)  Defendants argue there is no dispute Defendant Yates fired his weapon because Plaintiff pointed a gun at him and his wife, presenting a significant and imminent threat to their safety, and therefore his use of force was objectionably reasonable.  (Doc. 47-1 at 8–10.)

> **a.      Legal Standard**

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.   "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez,* 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.").   "[F]orce that creates a substantial risk of causing death or serious bodily injury" is deadly force, *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005), and "apprehension by the use of deadly force is a 'seizure'", *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Here, it is undisputed that Defendant Yates used deadly force against Plaintiff.

Determining whether the deadly force Defendant Yates used against Plaintiff violates the Fourth Amendment requires a "careful balancing" of the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's

1    conduct was objectively reasonable based on the totality of the circumstances.  *Graham,* 490 U.S.

2    at 396–97; *Price v. Sery,* 513 F.3d 962, 968 (9th Cir. 2008); *Miller v. Clark Cty.,* 340 F.3d 959,

3    964 (9th Cir. 2003).    To conduct this balancing, the court must evaluate "the facts and

4    circumstances of each particular case, including the severity of the crime at issue, whether the

5    suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

6    resisting arrest or attempting to evade arrest by flight."  *Graham,* 490 U .S. at 396.  "The calculus

7    of reasonableness must embody allowance for the fact that police officers are often forced to make

8    split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the

9    amount of force that is necessary in a particular situation."  *Id.* at 396–97. The most important

10   factor is whether the suspect poses an immediate threat to the safety of the officers or others.  *Id.*

11   at 396.

12        The *Graham* factors, however, are not exhaustive.  *George v. Morris*, 736 F.3d 829, 837–

13   38 (9th Cir. 2013).  Rather, courts are to "examine the totality of the circumstances and consider

14   'whatever specific factors may be appropriate in a particular case, whether or not listed in

15   *Graham*.'"    *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v.*

16   *Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).    Reasonableness of the use of force is usually a

17   question for the finder of fact, rather than a question of law.  *Chew v. Gates*, 27 F.3d 1432, 1443

18   (9th Cir. 1994).  "Because this inquiry is fact-sensitive, summary judgment should be granted

19   sparingly."  *Maxwell v. Cty. of San Diego,* 708 F.3d 1075, 1086 (9th Cir. 2013) (citing *Santos v.*

20   *Gates,* 287 F.3d 846, 853 (9th Cir. 2002) (The three-step balancing analysis of an excessive force

21   claim "nearly always requires a jury to sift through disputed factual contentions, and to draw

22   inferences therefrom . . . .")); *see also Espinosa v. City & Cty. of San Francisco,* 598 F.3d 528,

23   537 (9th Cir. 2010) ("[T]his court has often held that in police misconduct cases, summary

24   judgment should only be granted 'sparingly' because such cases often turn on credibility

25   determinations by a jury.").

26        **b.      Analysis**

27        Defendants contend that Defendant Yates' use of deadly force was objectively reasonable

28   under the circumstances because it was a "last resort" after Plaintiff made a U-turn at Orchard and

University Avenues and pointed his gun at Officer Yates and his wife a second time.  (Doc. 47-1 at 9.)  Plaintiff was an "immediate and significant threat to Officer Yates," as evidenced by Plaintiff's statement to Officer Foss that he "thought he was going to have to shoot the guy," as well as the fact that Plaintiff "never thought to call the police despite claiming he feared for his safety."  (*Id.*)  Defendants assert that the "undisputed evidence" shows that Defendant Yates' fear for his safety was credible because Plaintiff had earlier pointed a gun at Defendant Yates and his wife on Schnoor Avenue at Riverview.  (*Id.*)

Plaintiff contends that he did not point his gun at Defendant Yates or his wife, but instead removed it from the glove compartment of his truck, "placed it on the passenger seat and held it on the seat with the open palm of his right hand" just before he attempted the U-turn.  (Doc. 54 at 4.)  Plaintiff did so "in fear for his safety," having been "yelled at" and "followed and stalked" by Defendant Yates.  (*Id.*)  Plaintiff asserts that as he was attempting to get away from Defendant Yates' SUV by making the U-turn "to reverse his direction," Defendant Yates "without authority and without provocation shot and injured" Plaintiff.  (*Id.*)

Defendants cite to the undisputed statement of fact that "[w]hen asked about circumstances leading to the shooting, Plaintiff stated at least four different times that he pulled out his weapon and pointed it at Officer Yates when Officer Yates blocked him with his SUV."  (Doc. 47-1 at 9 (citing JSUF 49).)  This fact is based on statements Plaintiff made to Officer Alva at the scene after the shooting.  (*See* JSUF 49.)  Defendants also cite the video recording of the interrogation of Plaintiff by Officer Foss and the excerpts of the transcription of that recording as further evidence that Plaintiff pointed a gun at Officer Yates after Officer Yates "cut him off" as Plaintiff was making the U-turn at Orchard and University Avenues.  (*See* Doc. 56 at 4–5 (citing Foss Interrogation Video and Foss Interrogation Tr. at 26:15–27:17).)

Despite these statements, Plaintiff has offered sufficient evidence to create a disputed issue of material fact as to whether Plaintiff pointed his gun at Defendant Yates and/or Mrs. Yates just before the shooting.  *Smith*, 661 F.3d at 441 (whether suspect posed immediate threat to the safety of officers or others is the most important *Graham* factor).  Plaintiff testified that before he pulled away from the curb on Orchard Avenue, he "removed [his] .40 caliber Smith & Wesson firearm

from the glove compartment of [his] truck and [he] placed it on the passenger seat." (Romero Decl. at ¶ 6; Romero Dep. at 59:9–60:12, 63:18–64:24.)  As he pulled away from the curb, he "held [his] hand, opened palm, over the firearm while it laid [sic] on the passenger seat." (Romero Decl. at ¶ 6; Romero Dep. at 59:9–25.)  Plaintiff placed the gun there "just for my safety." (Romero Dep. at 65:12–66:1.)  Plaintiff testified in his deposition that at no point did he ever raise or point this gun at Defendant Yates:

> Q. And at any point did you pick up your weapon?
> A. No. It was still -- I still had my hand over it. I remember, you know, if you can kind of imagine that position. (Indicating.)
> Q. So you didn't point the gun at him?
> A. No. No
> [. . .]
> Q. But you didn't -- did you at any point raise your weapon?
> A. No. No.

(Romero Dep. at 71:5–11; 73:8–10.)  Plaintiff similarly declared under penalty of perjury that "[a]t no time during time period alleged in the complaint in this matter did I ever point any firearm of any kind at James Yates or Jenny Yates."  (Romero Decl. at ¶ 5; *see also id.* ¶6 ("[a]t no time did I ever point, show, direct my firearm at the SUV or any other person.  My firearm remained on the passenger seat with my open hand covering the firearm until the firearm fell onto the passenger side floor board.").)

The "general rule in the Ninth Circuit," sometimes termed the "*Foster-Radobenko* rule," is that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (citing *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir. 1975)).  While Defendants acknowledge that unsworn testimony like Plaintiff's statements to Officers Alva and Foss cannot provide a basis for the Court to disregard Plaintiff's contrary sworn testimony, *see Leslie v. Grupo ICA*, 198 F.3d 1152, 1158–59 (9th Cir. 1999), they argue that Plaintiff's deposition testimony and declaration should nevertheless be rejected as "sham" testimony because Plaintiff "explicitly adopted" at his

1  deposition his earlier recorded statements to MPD, citing *Kibbee v. City of Portland*, No. CV-98-
2  675-ST, 1999 WL 1271868, at *5 (D. Or. Dec. 23, 1999).  (*See* Doc. 56 at 3.)

3      First, while it is true that the *Foster-Radobenko* rule applies to conflicts between affidavits
4  submitted in opposition to a motion for summary judgment and prior deposition testimony,
5  Defendants offer no authority for the application of the rule to purported conflicts between
6  *deposition testimony* submitted in opposition and prior statements.  Indeed, that would seem an
7  odd application, given that the rationale of the rule is to prevent parties from manufacturing a
8  triable issue of fact by preparing and submitting a contradictory affidavit for the purpose of
9  opposing summary judgment.  *See Kennedy*, 952 F.2d at 266 ("[I]f a party who has been examined
10 at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting
11 his own prior testimony, this would greatly diminish the utility of summary judgment as a
12 procedure for screening out sham issues of fact.") (quoting *Foster*, 772 F.2d at 1462; *Radobenko*,
13 520 F.2d at 544).  Here, there was no motion for summary judgment pending at the time Plaintiff
14 was deposed, and there is no reason for the Court to believe that Plaintiff gave allegedly
15 conflicting testimony at his deposition for the purpose of creating a triable issue of fact to oppose a
16 hypothetical summary judgment motion that Defendants could bring in the future.

17     However, even if the Court were to consider the application of the *Foster-Radobenko* rule
18 to the situation at bar, to the extent that Plaintiff's deposition testimony and declaration contradicts
19 his prior interview statements to Officers Alva and Foss, those interview statements were not
20 sworn testimony and thus do not trump or supplant Plaintiff's deposition testimony and
21 declaration.  *See Leslie*, 198 F.3d at 1158–59.  Defendants' reliance on the exception set forth in
22 *Kibbee* is misplaced.  Distinguishing *Leslie*, the *Kibbee* court treated the plaintiff's prior unsworn
23 statements as sworn testimony "for purposes of this motion" only because "plaintiff affirmed the
24 truthfulness and accuracy of her taped recorded statement in her sworn deposition, and also relied
25 on it in her pleadings opposing summary judgment."  1999 WL 1271868, at *5.  Here, Plaintiff's
26 counsel stipulated at the deposition to the audio recording of the interview taken by Officer Alva
27 at the scene, and Plaintiff, while watching portions of the video at the deposition, gave the
28 following testimony:

1    Q. I'm going to play a little bit for you. And then you can tell me if you understand that
        that's -- if -- whether or not that was your recorded statement.

2    (Video playing)

3    A. May I hear that again?

4    Q. I'm going to stop right there.  Was that you who initially --

     A. Yeah. But I believe it was me, but I didn't hear exactly what I had said.

5    Q. Okay. But was that -- do you recognize that as your voice?

6    A. Um, again, I don't have . . .

7    (Video playing.)

8    Q. Let me just pause right there.  We heard -- did you recognize your voice in that
        recording?

9    A. Yeah.

10   Q. And do you recognize that question, "Why did you start hitting me?"

11   A. I think I did say that .. Yeah.

12   Q. Do you remember who you were asking that to?

     A. Just the officers around me. I didn't know who they were. I mean, I didn't see them.

13   (Video playing.)

14   Q. So you recognize the woman's voice to be that of the officer that interviewed you?

15   A. I believe so, that night, yes.

16   (Video playing.)

     A. And check that.

17   (Video playing.)

18   Q. Do you recognize this as a recording of your interview statement that you gave to
        Officer Alva?

19
     A. I mean, I recognize this or -- yeah.

20   Q. So yes? Is this a recording of --

21   A. The woman. Yes. Yes. Yes.

22   Q. Is this a recording of the interview you gave at the scene?

23   A. Yeah.

24   Q. Okay. Is this the first you've heard this?

     A. Yes.
25

26   (Romero Dep. at 209:11–211:20.)  With respect to the video recording of Plaintiff's interview by

27   Officer Foss, Plaintiff testified as follows:

28       Q. And it's basically, it's a CD, a DVD that contains a video and an audio recording

                                                 23

taken from the interrogation room at the Madera PD.  And I just want to play for you portions of it to have you verify that this is, indeed, the video and the audio from your interview with Officer Foss.  Okay.  And again, just to represent that this video and audio recording was produced by my office to Mr. Geringer -- and from my understanding is from his office to mine as part of the initial disclosures.

[. . .]

(Video playing.)

Q. So this is the beginning of the video.  Does like the chair you sat on at Madera PD office?

A. I don't remember.

Q. Well, you're going to show up soon, so . . .

A. Yeah.

(Video playing.)

Q. So I skipped ahead in the video, and I wanted to confirm this is you in the video. Is this a picture -- is this you video of you?

A. Yes.

Q. And it looks like you're sitting here.  You're waiting.  It looks like someone else is in here.  But does this look like the video from the room where you were interviewed?

A. I've never seen the video, but that's me.

Q. But this looks like a video recording of the room where you were talking to Officer Foss at Madera PD?

A. I can't remember every detail, but no. Yeah.

Q. Do you have any reason to believe this isn't the video of your interview with Officer Foss?

A. I never knew that was a video. And when you asked me to describe the room, I don't remember what the room looks like.

Q. Okay. Do you remember this gentleman here seated at the lower half of the video?

A. I see his face. I can probably remember him, yeah.

Q. Do you recognize the man asking you the question as Officer Foss now?

A. I remember -- not word for word, but I remember -- just -- I just started hearing it.

Q. But my question is: Do you remember if this is Officer Foss that's interviewing you right now?

A. I don't know.  I don't remember him. I would have to see his face.  I don't remember if that's him.

Q. But that's you answering the questions?

A. Yeah.

1    (*Id.* at 206:16–208:20.)  Plaintiff's counsel thereafter stipulated on the record that what was shown

2    at the deposition was the video recording during Plaintiff's interview by Officer Foss at MPD that

3    Plaintiff supplied to Defendants in his initial disclosures under Fed. R. Civ. P. 26.  (*See id.* at

4    208:25–209:10.)

5         In contrast to the affiant in *Kibbee*, Plaintiff did not at his deposition "affirm[] the

6    truthfulness and accuracy" of his audio recorded statements to Officer Alva, or his video recorded

7    statements to Officer Foss.  Plaintiff was not asked, for example, whether everything he said to

8    Officers Alva and Foss was truthful and, if not, whether there were any corrections that needed to

9    be made.[3]  *See Kibbee*, 1999 WL 1271868, at *5.  Instead, Plaintiff was asked only to verify the

10   *authenticity* of the audio and video recordings, to which his counsel ultimately stipulated.  As

11   such, the *Foster-Radobenko* rule does not bar Plaintiff's sworn deposition testimony and

12   declaration in favor of his prior unsworn interview statements, even if contradictory.  Plaintiff's

13   deposition testimony and his declaration are admissible evidence that Plaintiff never pointed a gun

14   at Defendant Yates and/or Mrs. Yates immediately prior to the shooting.  It is for the jury to

15   decide how to credit Plaintiff's statements during the police interviews.[4]  *Leslie*, 198 F.3d at 1159.

16   Based on the evidence offered by Plaintiff, a reasonable jury could find that Defendant Yates'

17   action in shooting Plaintiff was not reasonable.  *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir.

18   1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to

19   their safety or to the safety of others simply because they are armed."); *Curnow v. Ridgecrest

20   Police*, 952 F.2d 321, 323 (9th Cir.1991) (holding deadly force was unreasonable where,

21

---

22   [3] Notably, the court in *Kibbee* ultimately declined to apply the *Foster-Radobenko* rule because at the time of the police
     interview, the plaintiff had just had "a long and traumatic night, without the benefit of preparation or notice, and

23   without friends, family or counsel," whereas her later deposition "was taken with certain formalities that encourage
     truthfulness, accuracy, and fairness."  1999 WL 1271868 at *7.  As such, *Kibbee* supports this Court's holding that the

24   *Foster-Radobenko* rule should not bar Plaintiff's sworn deposition and declaration.
     [4] Plaintiff's statements are not the only evidence that creates a triable issue of fact as to whether he pointed a gun at

25   Defendant Yates and/or Mrs. Yates just before the shooting.  There is a dispute, for example, as to whether Plaintiff
     waived his gun out his driver's side window, as Defendant Yates claimed.  (Prelim. Hr'g Tr. at 239:13–240:11, 243:9–

26   244:7.)  Eyewitness Mr. Dunivan stated in his supplemental declaration that he did not see Plaintiff point his gun
     outside the window of his truck (although he clarified that he could not see, nor could he have seen, whether Mr.

27   Plaintiff pointed his weapon *inside* his truck at Defendant Yates).  (Supp. Dunivan Decl. at ¶ 3.)  Officer Ruvalcaba
     found Plaintiff in his truck with the driver's side window in a closed position.  (JSUF 33.)  Plaintiff, however, testified

28   at his deposition that following the shooting a CHP Officer grabbed his neck in a headlock position and was trying to
     pull Plaintiff out the (ostensibly open) driver's side window.  (Romero Dep. at 75:10–14.)

according to plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).  The parties dispute facts that bear directly on whether a reasonable officer would have viewed Plaintiff as an immediate threat to Defendant Yates.  Resolution of disputed material facts about whether Plaintiff pointed a gun at Defendant Yates and/or his wife involve credibility determinations and interpretation and inferences from the evidence—including the audio and video recorded statements made to MPD by Plaintiff—which are within the province of a jury.  Whether Plaintiff posed a threat to the officers is the most critical fact in assessing the reasonableness of Defendant Yates' conduct, and because there are material factual disputes as to the threat that Plaintiff posed, the Court cannot conclude as a matter of law that Defendant Yates acted reasonably in shooting Plaintiff.

Additionally, there are several critical factual disputes about the events leading up to the shooting.  *See Morgutia-Johnson*, 2015 WL 1892904, at *14 (denying the defendants' summary judgment motion on plaintiff's excessive force claim where the "undisputed" videotape evidence "sheds no light on what happened leading up to Plaintiff's arrest.")  While Defendant Yates testified that he observed Plaintiff ran the stop sign at Dutra Avenue, Plaintiff denies that claim.  (DSSUF 1; Prelim. Hr'g Tr. at 181:1–4; PSSUF 5; Romero Decl. at ¶ 3.)  Mrs. Yates' testimony is that both vehicles were at the stop sign at Dutra Avenue, and that their SUV left ahead of Plaintiff's vehicle from the stop sign, Prelim. Hr'g Tr. at 81:13–24, which casts doubt on Defendant Yates' version of events.

Defendants also contend that Defendant Yates' fear for his safety was "credible" because Plaintiff "had earlier pointed a gun at them" while heading toward the stop sign at Schnoor and Jefferson/Riverview Avenues, characterizing this fact as "undisputed."  (Doc. 47–1 at 9:10–11.) Defendant Yates testified that, when Plaintiff pulled his truck alongside Defendant Yates' SUV, he saw Plaintiff point a gun toward Defendant Yates and Mrs. Yates and heard Plaintiff yell out the window, "What's up, what's up now, bro?"  (DSSUF 3; Prelim. Hr'g Tr. 188:5–189:11.) However, Plaintiff in his sworn declaration denies pointing a firearm of any kind at Defendant Yates or Mrs. Yates.  (Romero Decl. at ¶ 5.)  According to Plaintiff, he stopped at the stop sign at Schnoor and Riverview/Jefferson, with his driver's side window down, at which point Defendant

1  Yates' SUV pulled alongside Plaintiff to the right (in the right-turn lane) and began yelling at him

2  again and pointing.   (*Id.* at ¶ 6; Romero Dep. at 45:5–46:14.)   Plaintiff then "flipped off"

3  (displayed his middle finger at) Defendant Yates and continued proceeding southbound on

4  Schnoor Avenue, toward his home approximately five blocks away.   (Romero Decl. at ¶ 6;

5  Romero Dep. at 47:25–48:12; MPD Report at 8.)

6       Mrs. Yates testified that she did not see a gun at that time, only that Defendant Yates had

7  told her that he saw a gun. (Prelim. Hr'g Tr. at 90:10–24.)   At that point, Mrs. Yates, as instructed

8  by Defendant Yates, called 911 and reported that Plaintiff had pointed a silver gun at her and

9  Defendant Yates. (Prelim. Hr'g Tr. 91:18–23, 189:9–11; Yates Decl. at ¶ 2; JSUF 7.)   On the call,

10  Defendant Yates is heard telling Mrs. Yates that Plaintiff has a "black semi-automatic" handgun,

11  which Mrs. Yates relayed to dispatch.[5]   (JSUF 13; PSSUF 7; Prelim. Hr'g Tr. at 188:14–19.)

12  Defendants point to that fact that the Madera District Attorney charged Plaintiff with two counts

13  of felony brandishing as further evidence that Plaintiff pointed a gun at Defendant Yates and Mrs.

14  Yates both on Schnoor Avenue and at the intersection of Orchard and University Avenues.   (Doc.

15  56 at 8 (citing JSUF 51).)   The undisputed fact that Plaintiff was charged with two brandishing

16  counts, however, does not establish that Plaintiff, in fact, brandished a gun, as it is also undisputed

17  that Plaintiff was not convicted of either count.   Instead, both counts were dismissed without

18  prejudice. (JSUF 52.)

19       Given that, viewing the facts in the light most favorable to Plaintiff, a fact finder could

20  reasonably conclude that Plaintiff did not point his gun on Schnoor Avenue (and therefore did not

21  commit the crime of brandishing), a fact finder could therefore find that Defendant Yates acted

22  unreasonably in following Plaintiff's truck—particularly where the vehicle had already been

23

24  [5] Whereas whether Plaintiff pointed at gun at Defendant Yates and Mrs. Yates on Schnoor heading toward the
   intersection at Jefferson/Riverview Avenues is a material fact issue, the color of the gun—whether silver, as Mrs.

25  Yates informed the 911 dispatcher; black, as Defendant Yates reported to Mrs. Yates; or gray and chrome, as Plaintiff
   claims—is not. *Anderson*, 477 U.S at 248 (Material facts which would preclude entry of summary judgment are those

26  which, under applicable substantive law, may affect the outcome of the case.)   Questions of fact regarding immaterial
   issues cannot defeat a motion for summary judgment.  *See Reynolds v. County of San Diego*, 84 F.3d 1162, 1168–70

27  (9th Cir. 1996) (summary judgment properly granted where questions of why gun did not fire, minor inconsistency in
   officer's version of events, and expert's disagreement with steps taken by officer immaterial to material question of

28  whether officer reasonably used deadly force), *rev'd on other grounds* by *Acri v. Varian Associates, Inc.*, 114 F.3d
   999 (9th Cir. 1997).

reported and law enforcement dispatched—and stopping and parking behind him multiple times without identifying himself as law enforcement, causing Plaintiff to become concerned for his safety.  (*See* JUSF 9–10, 14, 16; Yates Decl. at ¶ 3; Romero Decl. at ¶ 6; Prelim. Hr'g Tr. at 102:19–25, 122:9–26, 193:15–196:12; MPD Report at 6–7, 9–11); Romero Dep. at 58:21–59:8.) A fact finder could also reasonably conclude that at the time Plaintiff began his U-turn at Orchard and University Avenues, he was trying to navigate away from Defendant Yates for safety concerns, thereby calling into question the reasonableness of Defendant Yates' belief that Plaintiff was "trying to kill" Defendant Yates or evade arrest.  (*See* Romero Decl. at ¶ 6; Romero Dep. at 59:9–25.)  As a result, the fact finder could conclude that Defendant Yates' turning his SUV into the path of Plaintiff's truck to block his way was an unnecessary escalation.  (*See* Romero Decl. at ¶6; Foss Interrogation Tr. at 26:1–6, 26:15–27:17; Prelim. Hr'g Tr. at 242:8–16; MPD Report at 11.)  The resolution of these factual disputes bears on the ultimate issue of whether Defendant Yates' use of deadly force was reasonable under the totality of the circumstances.  *See Graham*, 490 U.S. at 396 (Courts must evaluate "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.")  It is for the jury to consider each party's version of events, weighing Defendant Yates' testimony, that of Plaintiff, and drawing inferences from the audio and video recorded statements of Plaintiff to MPD.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (jury has responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"); *Wall v. Cty. of Orange,* 364 F.3d 1107, 1110 (9th Cir. 2004) (Where facts are disputed, their resolution and determinations of credibility "are manifestly in the province of a jury.") (quoting *Santos,* 287 F.3d at 852).

For these reasons, Defendants' Motion as to Plaintiff's § 1983 claim of excessive force under the Fourth Amendment against Defendant Yates will be denied.

**2.    Defendant Jimenez is Entitled to Summary Judgment on Plaintiff's Claim for Excessive Force.**

Plaintiff claims that Defendant Jimenez acted unreasonably in grabbing Plaintiff, hitting

1  him in the face, and forcing him down onto the roadway to be handcuffed in violation of his

2  Fourth Amendment rights. (Compl. at ¶¶ 26–31.) Defendants argue that Defendant Jimenez's use

3  of force was objectively reasonable because Plaintiff was passively resisting and noncompliant

4  and because Defendant Jimenez believed Plaintiff was trying to escape or use his truck as a

5  weapon. (Doc. 47-1 at 10–12.)

6      Under the *Graham* analysis, and viewing the evidence in the light most favorable to

7  Plaintiff, a reasonable jury could not conclude that Defendant Jimenez violated Plaintiff's

8  constitutional rights. The following facts are undisputed: Officer Jimenez heard a broadcast over

9  the CHP dispatch that a CHP Officer's wife had reported a brandishing. (JSUF 26.) While en

10 route to the location of the brandishing, dispatch informed Defendant Jimenez that there had been

11 a shooting and that an off-duty CHP officer was involved. (JSUF 28.) As Defendant Jimenez

12 approached Plaintiff's truck, he saw a gun lying on the floorboard on the passenger side. (JSUF

13 32.) Plaintiff was ordered by CHP officers to unlock the doors of his truck, but he did not comply.

14 (JSUF 34.) As Defendant Jimenez opened the driver's side door (after Officer Lancaster unlocked

15 it for him, having broken the passenger window with his baton), Plaintiff's truck, which had an

16 automatic transmission, started rolling forward at least 15 feet. (JSUF 35–37.) Seeing the truck

17 moving as soon as he opened the door, Defendant Jimenez believed Plaintiff was trying to escape

18 or that he would use his truck as a weapon. (JSUF 38.) Defendant Jimenez punched Plaintiff

19 once in his cheek to distract him so that Defendant Jimenez could reach into the gear shift on the

20 steering wheel and put the transmission into park. (JSUF 39.) Defendant Jimenez then grabbed

21 Plaintiff, pulled him towards him, and locked him in place so that Plaintiff could not reach for his

22 gun. Officer Jimenez reached around Plaintiff and put the truck's transmission in park with his

23 right hand, which caused the transmission to grind. (JSUF 41.) Once the truck was parked,

24 Plaintiff did not exit the vehicle despite being instructed to do so by the CHP Officers. (JSUF 42.)

25 Plaintiff was then placed on the ground, and his cheeks were scraped on the asphalt as Plaintiff

26 tried to push his head up from the ground. (JSUF 43.)

27      In his opposition to Defendants' Motion, Plaintiff asserts that Defendant Jimenez engaged

28 in excessive force when he "struck [Plaintiff] with multiple closed fist punches" on both sides of

his face, "grabbed [him] in a headlock," and thereafter "slammed [him] face first into the roadway." (*See* PSSUF 33; Doc. 54 at 6.)   Plaintiff contends that this use of force was unreasonable, given that Defendant Jimenez was aware of Plaintiff's injury from having been shot by Defendant Yates, and also because Plaintiff was not acting violent and was compliant with the officers' demands to put his hands up.[6]  (Doc. 54 at 6.)

In support of his allegations of the degree of force used by Defendant Jimenez, Plaintiff points solely to his deposition testimony.  (*See* PSSUF 33 (citing Romero Dep. at 75:23–76:2).) While Plaintiff does testify that he was placed into a headlock and hit repeatedly, he fails to identify *Defendant Jimenez* as having committed those acts:

> Q. Okay. So what did you do with the gun?
>
> A. I remember hearing officers shout out, ''Put your hands up," that type of thing.
>
> Q. Okay.
>
> A. Yeah. So I remember, you know, leaving my gun there and sitting up on my seat. I'm thinking they're talking about this guy.  And next thing I know, I feel -- later I found out it was another CHP that grabbed my neck, like, in a headlock position. And he was trying to get me out -- excuse me -- out of my driver's side window and, like, choking me.  And I remember upset because it's, like, why are you guys doing this to me, you know.  And then I felt another turned out to be another CHP officer had his arm again, like, in a choke hold-type around my neck.  And he was hitting me.  And at the same time he was hitting me, he kept telling me, "Quit resisting," and I was upset telling him, "I ain't F'ing resisting.  I can't even get out of my seat belt."  And I remember they're -- you know, every time he would hit me on one side, I would turn my head to avoid the hit, and he would turn around with his other hand and hit me on the other side, while still the other guy trying to get me out of my window.  And I remember trying to reach over to unhook my safety belt, and I was choking.  And the next thing I know, I heard -- it would be my passenger's side window bust.  So I'm presuming somebody unhooked me, maybe another officer.

(Romero Dep. 75:4–76:7.)  Plaintiff provides no evidence that Defendant Jimenez—as opposed to

---

[6] Plaintiff does not dispute in his opposition that Defendant Jimenez's use of force in handcuffing Plaintiff was reasonable.  In view of the undisputed evidence that as Officers Lancaster, Ruvalcaba, and Defendant Jimenez tried to handcuff Plaintiff, Plaintiff "straightened out his arms making it difficult for the officers to do so," (JSUF 44; Romero Dep. at 88:12–22), the Court finds there is no triable issue of fact as to the objective reasonableness of Defendant Jimenez's use of force to hold Plaintiff still in order to handcuff him.   This is so even despite the officers' testimony that Plaintiff did not punch, kick, or bite the officers when being removed from his vehicle, (Lancaster Dep. at 44:10–20; Ruvalcaba Dep. at 26:25–27:3).  *See Wisler v. City of Fresno*, No. CV F 06-1694 AWI SMS, 2008 WL 2625865, at *7 (E.D. Cal. June 26, 2008) (finding that pulling an individual out of a car, placing him on the ground, and pinning one of his hands to his chest was reasonable under the Fourth Amendment, where the individual had not behaved in an assaultive manner but refused to comply with demands to exit the vehicle).

1  another CHP Officer on the scene—struck him "with multiple closed fist punches" or "grabbed
2  [him] in a headlock."  Nor does the above-cited testimony evidence the fact that Defendant
3  Jimenez–or anyone else–"slammed" him face first into the roadway.

4          Instead, as set forth above, the undisputed evidence is that once Plaintiff's truck began to
5  roll forward at least 15 feet, Defendant Jimenez punched Plaintiff once in his cheek to distract
6  him—what Defendants call a "distraction punch," (*see* Doc. 47–1 at 11)—so that Defendant
7  Jimenez could put the transmission into park because he believed that Plaintiff was trying to
8  escape or that he would use his truck as a weapon.  (JSUF 38–39.)  Defendant Jimenez grabbed
9  Plaintiff, pulled him towards him, and locked him in place so that Plaintiff could not reach for his
10  gun that Defendant Jimenez had observed on the floorboard of the truck.  (JUSF 32, 40.)  While
11  there is evidence in the record that Plaintiff complied with the officer's commands to show his
12  hands, (*see* Ruvalcaba Dep. at 22:7–23:4; Jimenez Dep. at 24:8–27:7), it is undisputed that
13  Plaintiff failed to exit the truck despite being instructed to do so by Defendant Jimenez, (JUSF
14  42), and Plaintiff adduces no evidence that his injury prevented his compliance with Defendant
15  Jimenez's repeated commands.  (*See* Jimenez Dep. 27:2–22.)   It is undisputed that Plaintiff was
16  then pulled from the vehicle and "placed"—not slammed—on the ground by Defendant Jimenez.
17  (JUSF 43; Jimenez Dep. at 27:8–22, 37:8–19.)  Plaintiff was placed onto the ground head first,
18  and Plaintiff scraped his cheeks on the asphalt as he tried to push his head up from the ground, to
19  avoid getting pushed into it.  (JSUF 43;CHP Report at 4; Romero Dep. at 87:25–88:6; Lancaster
20  Dep. at 44:21–25; Ruvalcaba Dep. at 33:15–24.)

21          The undisputed evidence shows that Plaintiff refused the CHP officers' commands to
22  unlock his doors and exit the vehicle, that he was armed, and that the truck which he was operating
23  behaved in a way that posed an immediate threat to the safety of Defendant Jimenez and the other
24  CHP officers.  The Court therefore finds that there is no triable issue of fact that the degree of
25  force used by Defendant Jimenez was justified in this case.  *See Smith*, 661 F.3d at 441.  *Cf.*
26  *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("Neither tackling nor punching
27  a suspect to make an arrest necessarily constitutes excessive force."); *Barber v. Santa Maria*
28  *Police Dep't*, No. CV 08–6273–DMG (MLG), 2010 WL 5559708, at *9 (C.D. Cal. Sept. 1, 2010)

31

(holding that officers' use of three "distraction strikes" to plaintiff's face and neck were objectively reasonable given that the plaintiff was refusing to comply with the officers' verbal commands, was attempting to destroy evidence, and was physically resisting attempts to handcuff him.). Defendant Jimenez is entitled to summary judgment on Plaintiff's § 1983 claim of excessive force under the Fourth Amendment.

**B.     Defendant Yates is Not Entitled to Qualified Immunity as to Plaintiff's Excessive Force Claim at Summary Judgment.**

Defendants alternatively argue that Defendant Yates is shielded by qualified immunity as to Plaintiff's excessive force claim.

### 1.     Legal Standard

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201). This prong of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly

1    established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.  At step

2    two, "the relevant, dispositive inquiry in determining whether a right is clearly established is

3    whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

4    confronted." *Saucier*, 533 U.S. at 202.  "Qualified immunity is applicable unless the officials

5    conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232 (citing

6    *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   However, in "Fourth Amendment

7    unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the

8    inquiry made on the merits." *Scott v. Henrich*, 39 F.3d 912, 914–15 (9th Cir. 1994) (quoting

9    *Hopkins v. Andaya*, 958 F.2d 881, 885 n.3 (9th Cir. 1992)).

10        **2.      Analysis**

11        At step one, as discussed above, Plaintiff has raised disputed issues of fact as to whether

12   Defendant Yates violated Plaintiff's Fourth Amendment rights.  As such, this Court turns its focus

13   to whether such rights were clearly established, that is, whether a reasonable officer would

14   understand that his conduct was unlawful under the circumstances.

15        Defendants argue, and Plaintiff does not dispute[7], that as of December 2012, when

16   Defendant Yates shot Plaintiff, case law clearly established that "when there is probable cause to

17   believe there is an immediate threat of serious bodily injury," the officer is justified in using

18   deadly force.  (*See* Doc. 47-1 at 12:27–13:1) (citing *Willis v. Cty. of Sacramento*, No. 2:13-cv-

19   01671-MCE-EFB, 2016 WL 4210051, at *7 (E.D. Cal. Aug. 10, 2016)).   The bona fide factual

20   disputes outlined above surrounding the shooting bar qualified immunity, because questions

21   remain whether the use of deadly force was reasonable.  Plaintiff presents evidence to raise factual

22   questions whether a reasonable officer would understand that he could shoot six rounds at Plaintiff

23   when the evidence, resolved in Plaintiffs' favor, is that he did not threaten the officer with serious

24   bodily injury.  While Plaintiff was in possession of a gun immediately prior to the shooting, there

25   is evidence that Plaintiff never pointed his gun at Defendant Yates and/or Mrs. Yates.  There is

26   ---

27   [7] Plaintiff's opposition fails to address Defendants' qualified immunity argument and therefore concedes this point.
     *See Hall v. Mortgage Investors Group*, No. 2:11–CV–00925–JAM–GGH, 2011 WL 4374995, *5 (E.D. Cal. Sept. 16,
     2011) (failure to oppose argument amounts to a concession as to the truth of the argument); *see also Ramirez v.

28   Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 (N.D. Cal. 2013) (finding that the failure to respond to argument
     amounts to a concession that the argument has merit).

1    also evidence that at the time Plaintiff began to U-turn at the intersection of Orchard and

2    University Avenues, Plaintiff was trying to navigate *away* from Defendant Yates for safety

3    concerns.  The case authority cited by Defendants does not support a finding that, where a suspect

4    does not threaten an officer and attempts to move away from him, deadly force is reasonable.

5    Factual issues arise whether Defendant Yates was mistaken in his use of deadly force or

6    misapprehended the need for deadly force and if so, whether such mistake or misapprehension was

7    reasonable.

8            In sum, evaluating the evidence in Plaintiff's favor, this Court is unable to conclude that

9    Defendant Yates' use of deadly force was objectively reasonable under the circumstances, so as to

10   entitle him to qualified immunity.  While he may be entitled to qualified immunity after the

11   disputed material facts are resolved, the Court denies Defendants' Motion to the extent it seeks

12   qualified immunity for Defendant Yates' shooting of Plaintiff.  *Wilkins v. City of Oakland*, 350

13   F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on

14   the resolution of disputed issues of fact in their favor, and against the non-moving party, summary

15   judgment is not appropriate."); *Lolli v. Cty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003); *Serrano

16   v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) ("If a genuine issue of material fact exists that

17   prevents a determination of qualified immunity at summary judgment, the case must proceed to

18   trial."); *Santos*, 287 F.3d at 855 n.12 (finding it premature to decide the qualified immunity issue

19   "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may

20   depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal

21   citation omitted).

22   **C.      State Law Claims**

23           Plaintiff's allegations of excessive force also form the basis for his state law assault,

24   battery, and negligence claims against Defendant Yates and his battery claim against Defendant

25   Jimenez.  *See* Compl. ¶¶ 10–20.  "California assault and battery claims are the counterpart to

26   plaintiff's federal claims for excessive force brought under § 1983."  *Martin v. City of S. Lake

27   Tahoe*, No. CIVS05-2167 FCD KJM, 2007 WL 2176372, at *12 (E.D. Cal. July 26, 2007).  Under

28   California law, to prevail on a claim for assault and battery, the plaintiff must establish that the

1   officer used excessive force against him.  *Johnson v. County of Los Angeles*, 340 F.3d 787, 794

2   (9th Cir. 2003); *Ortega v. City of Oakland*, No. C07-02659JCS, 2008 WL 4532550, at *13 (N.D.

3   Cal. Oct. 8, 2008) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1988)).  To

4   prevail on a common law claim of negligence against a police officer, Plaintiff must show that (1)

5   the officer owed plaintiff a duty of care; (2) the officer breached the duty by failing "to use such

6   skill, prudence, and diligence as other members of profession commonly possess and exercise,"

7   (3) there was a "proximate causal connection between the [officer's] negligent conduct and the

8   resulting injury" to the plaintiff; and (4) the officer's negligence resulted in "actual loss or

9   damage" to the plaintiff.  *Xiong*, 2015 WL 4598861, at *37 (quoting *Harris v. Smith*, 157 Cal

10  .App. 3d 100, 104 (1984)).  Therefore, "to prevail on the negligence claim, Plaintiffs must show

11  that the Defendant officers acted unreasonably and that the unreasonable behavior harmed

12  Plaintiffs." *Robinson v. City of San Diego*, 954 F. Supp. 2d 1010, 1027 (S.D. Cal. 2013) (internal

13  quotation marks and citation omitted).  "Law enforcement officers do have a duty to refrain from

14  unreasonable use of deadly force."  *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1094

15  (2004).  The Fourth Amendment reasonableness standard applies to Plaintiff's state law assault,

16  battery, and negligence claims.  *See Young v. Cty. of L.A.*, 655 F.3d 1156, 1170 (9th Cir. 2011)

17  (citing *Munoz*, 120 Cal. App. 4th at 1108–09); *Samon v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th

18  Cir. 1999).

19       For the reasons discussed above in the Court's analysis of Plaintiff's Section 1983 claim,

20  there are issues of material fact as to whether Defendant Yates used reasonable force against

21  Plaintiff.  Accordingly, Defendants' Motion will be denied as to Plaintiff's assault, battery, and

22  negligence claims against Defendant Yates.  *See Xiong*, 2015 WL 4598861, at *37–38 (denying

23  motion for summary judgment on assault, battery, and negligence claims under California law

24  where the plaintiffs raised a triable issue of fact that the defendants used excessive force); *Lucas v.*

25  *City of Visalia*, No. 1:09-CV-1015 AWI JLT, 2013 WL 1915854, at *20 (E.D. Cal. May 8, 2013)

26  ("Defendants move for summary judgment on these state law claims because they contend that

27  Esparza's use of force was reasonable and lawful under the Fourth Amendment.  However, as

28  discussed above, there is a triable issue of material fact as to the reasonableness of Esparza's taser

1   use.  Thus, summary judgment on these claims will be denied."); *Martin v. City of S. Lake Tahoe*,

2   No. CIVS05-2167 FCD KJM, 2007 WL 2176372, at *12 (E.D. Cal. July 26, 2007).  However,

3   because Plaintiff has failed to raise a triable issue of fact regarding the liability of Defendant

4   Jimenez for excessive force, as set forth above, Defendants' Motion regarding Plaintiff's claim for

5   battery against Defendant Jimenez will be granted.

6       Finally, Defendants argue that Defendant Yates is immune from suit under California

7   Government Code § 820.2.  Section 820.2 provides immunity for police officers' discretionary

8   decisions made during arrests.  Cal. Gov't Code § 820.2; *Blankenhorn,* 485 F.3d at 487.  However,

9   it is well established that "this provision does not apply to officers who use unreasonable force in

10  making an arrest."  *Blankenhorn,* 485 F.3d at 487 (citing *Scruggs v. Haynes,* 252 Cal. App. 2d 256

11  (1967); *Robinson v. Solano County,* 278 F.3d 1007, 1016 (9th Cir. 2002)).  Because Plaintiff's

12  state law claims against Defendant Yates arise out of the alleged use of force against him,

13  regarding which there are disputes issues of material fact, Defendant Yates is not entitled to

14  immunity pursuant to § 820.2.  *See Blankenhorn*, 485 F.3d at 487 (9th Cir. 2007) (defendant

15  officers, relying on section 820.2, were not entitled to summary judgment on state law claims

16  where there were genuine issues of material fact on the reasonableness of the officers' use of

17  force); *Robinson*, 278 F.3d at 1016 (9th Cir. 2002) ("California denies immunity to police officers

18  who use excessive force in arresting a suspect.").

19                          **VI.      CONCLUSION**

20  For the reasons set forth above, IT IS HEREBY ORDERED that

21      1.      Defendants' Motion for Summary Judgment/Summary Adjudication is DENIED as

22  follows:

23              a.      Fourth Amendment claim for excessive force against Defendant Yates

24                      (Doc. 1-1, Compl., Fifth Cause of Action);

25              b.      Qualified Immunity for Fourth Amendment claim for excessive force

26                      against Defendant Yates; and

27              c.      State law claims for assault, battery, and negligence against Defendant

28                      Yates (Doc. 1-1, Compl., First, Second, and Third Causes of Action).

1          2.        Defendants' Motion for Summary Judgment/Summary Adjudication is GRANTED

2                    as follows:

3                    a.        Fourth Amendment claim for excessive force against Defendant Jimenez

4                              (Doc. 1-1, Compl., Fifth Cause of Action); and

5                    b.        State law claim for battery against Defendant Jimenez (Doc. 1-1, Compl.,

6                              Fourth Cause of Action).

7

IT IS SO ORDERED.

8

9   Dated:     **July 14, 2017**                                    /s/ *Sheila K. Oberto*

10                                                         UNITED STATES MAGISTRATE JUDGE

37